UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
WILBERT KITSON ANDREW TURNER,      :
                Plaintiff,      :
v.      :
       :
CORRECT CARE SOLUTIONS, d/b/a CCS,      :    **OPINION AND ORDER**
DR. RAUL ULLOA, DR. JOON PARK, N.P.      :
BOGUSLAWA USZYNSKI, N.P.      :    18 CV 3370 (VB)
ARANCHERILL, SGT. RANDAZZO,      :
WARDEN DIAZ, WARDEN KARL      :
VOLLMER, and JOHN and JANE DOES 1–20,      :
                Defendants.      :
------------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Wilbert Kitson Andrew Turner, proceeding pro se and in forma pauperis, brings

this action against defendants Correct Care Solutions ("CCS"), Dr. Raul Ulloa, Dr. Joon Park,

Nurse Practitioner Boguslawa Uszynski, Nurse Practitioner Arancherill,[1] Sergeant Randazzo,

Warden Leandro Diaz,[2] and Warden Karl Vollmer pursuant to 42 U.S.C. § 1983 and New York

state law, alleging defendants provided plaintiff constitutionally inadequate medical care at the

Westchester County Jail (the "Jail"), among other violations.[3]

      Now pending is defendants' motion to dismiss the amended complaint pursuant to Rule

12(b)(6).  (Doc. #34).

---

[1]      Incorrectly sued herein as "N.P. Aracheril."

[2]      Incorrectly sued herein as "Warden Daiz."  Diaz has not been served in this case.

[3]      Plaintiff also invokes 18 U.S.C. § 1505, which criminalizes "[o]bstruction of proceedings before departments, agencies, and committees."  Plaintiff fails to plead any facts supporting a claim under this statute.  Accordingly, any such claim is dismissed.  See 28 U.S.C. § 1915(e)(2)(B)(ii); see also Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007).

For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.[4]

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the amended complaint and its exhibits and draws all reasonable inferences in plaintiff's favor, as summarized below.[5]

At all relevant times, plaintiff was a pretrial detainee at the Jail. He alleges he suffers from orthopnea (shortness of breath when lying down), gastroesophageal reflux disease, scleroderma (an autoimmune disease) with digestive complications, a heart condition requiring a defibrillator, pulmonary congestion, hematuria (blood in urine), and bladder cancer.

In August 2017, a United States Magistrate Judge remanded defendant into pretrial custody and issued a medical attention form acknowledging plaintiff's "significant medical issues." (Compl. at 84). Plaintiff alleges he was taken to the Jail, which contracts with CCS to provide medical care to inmates.

I.      Orthopnea

On January 22, 2018, plaintiff alleges he saw non-party Dr. Hasan Kahn concerning plaintiff's orthopnea, among other ailments. Eleven days later, plaintiff allegedly reviewed a

---

[4]      The complaint and plaintiff's opposition brief state plaintiff wishes to move for summary judgment. (See Doc. #2 ("Compl.") at 10; Pl. Opp. Br. at 3). Plaintiff is advised that because defendants have not yet answered the amended complaint, a motion for summary judgment is premature. Therefore, plaintiff's motion for summary judgment is denied without prejudice. Plaintiff may refile a motion for summary judgment once discovery is complete.

[5]      On May 10, 2018, plaintiff submitted a letter styled a "Continued Complaint After Receiving Final Medical Records From CCS." (Doc. #13 ("Continued Compl.")). In view of plaintiff's pro se status, the Court issued an Order construing plaintiff's original complaint and May 10, 2018, letter together as the operative amended complaint. (Doc. #14).

report from Dr. Kahn and saw he had recommended that plaintiff manage his orthopnea by using extra pillows to sleep at a thirty-degree incline. Plaintiff claims he spoke with a nurse practitioner about this recommendation later that day. The nurse practitioner allegedly told plaintiff Jail policy forbade detainees from having extra pillows. Instead, the nurse practitioner arranged for plaintiff to immediately receive two extra blankets on which he could sleep at an incline.[6]

II.    Digestive Maladies

Plaintiff alleges he cannot eat food without vomiting unless he takes two thirty-milligram doses of Prevacid, an antacid medication, each day. Beginning September 1, 2017, plaintiff claims he received only one thirty-milligram dose of Prevacid daily, an amount purportedly inconsistent with his prior treatment. Plaintiff claims he could not eat breakfast during this period because the effects of his once-daily Prevacid dose would wear off.

Around September 25, 2017, plaintiff allegedly came under the care of CCS employee Dr. Park, to whom plaintiff explained his medical history and symptoms. Dr. Park increased plaintiff's Prevacid dosage from once to twice daily.

Plaintiff's Prevacid prescriptions from Dr. Park allegedly lasted two weeks. Plaintiff claims CCS staff prescribed him Prevacid without refills, forcing him continually to submit sick call slips, wait for the slips to be processed, wait for appointments to request new prescriptions, and then wait for new prescriptions to be filled. Plaintiff alleges this arrangement caused his

---

[6]    Elsewhere in the amended complaint, plaintiff appears to suggest defendants took nine days, not eleven, to provide him extra blankets: he alleges his "cardiologist made this recommen[dation] [on] 1/24/18." (Compl. at 70). The Court liberally construes the amended complaint as alleging defendant did not receive extra blankets until eleven days after Dr. Kahn recommended plaintiff sleep at an incline.

Prevacid prescription refills to be delayed seven times, causing him not to eat any food for periods of one to five days.

Plaintiff claims he was seen by a rheumatologist at Westchester Medical Center ("WMC") on December 4, 2017, who recommended plaintiff continue taking Prevacid. Two months later, on the morning of February 4, 2018, a nurse allegedly told plaintiff his Prevacid prescription again had expired. Medical records attached to the amended complaint indicate plaintiff's Prevacid prescription was renewed and administered at 5:00 p.m. that day.

On March 5, 2018, plaintiff was seen by a non-party physician at WMC who noted, "PLEASE CONTINUE PREVACID . . . OTHERWISE PATIENT UNABLE TO EAT." (Continued Compl. at 12).

III.     Congestive Heart Failure and Pulmonary Congestion

In late November 2017, Nurse Practitioner Arancherill allegedly examined plaintiff and, at plaintiff's request, prescribed Lasix for what plaintiff believed was weight gain caused by water retention symptomatic of congestive heart failure. Plaintiff claims he initially received only one Lasix dose but then asked for more and received a three-day prescription. However, on November 28, 2017, plaintiff claims he received only half his prescribed Lasix dosage after complaining of fluid in his lungs, sudden weight gain, difficulty breathing, and feeling "tired every 2 steps." (Pl. Opp. Br. at 2).

"[I]n late November or early December, 2017," plaintiff allegedly had difficulty breathing and noticed weight gain from "146 lbs. to 162 lbs. in less than a week." (Compl. at 7). On November 28, 2017, plaintiff saw a nurse practitioner who noted plaintiff had gained nine pounds in five days; prescribed "LASIX 20MG STAT[,] THEN AS ORDERED"; told plaintiff

to "[FOLLOW UP] WITH MEDICAL ASAP" if his symptoms worsened; and promised to have plaintiff's provider follow up within two days. (See id. at 63–64).

According to medical records attached to the complaint, plaintiff was not seen again until seven days later, when he told medical staff he felt "no dizziness" and "no [shortness of breath]." (Compl. at 49). On December 15, 2017, when plaintiff complained he felt "a little short of breath" while walking, a nurse noted plaintiff was in "[n]o distress," told plaintiff "to rest and notify med[ical staff] if any further symptoms," and notified a nurse practitioner. (Id. at 66). CCS staff saw plaintiff again on December 19, 2017, performed a "[blood pressure] and weight routine check," and recorded plaintiff's weight as 161 pounds. (Id. at 67).

Approximately one month later, on January 22, 2018, non-party Dr. Kahn saw plaintiff at WMC and noted he was "[l]ast seen in 11/2017 when he was stable from CHF standpoint," and had been taking "intermittent [L]asix at his correctional facility which helps when he noticed he has gained weight [sic]." (Compl. at 15). Dr. Kahn recommended plaintiff take forty milligrams of Lasix daily, among other things. In what plaintiff describes as an "obvious oversight," plaintiff alleges CCS did not implement this recommendation until plaintiff reviewed his medical records and followed up with CCS medical staff eleven days later. (Id. at 17). Plaintiff claims he received the medications recommended by Dr. Kahn only after "a whole month of pain and suffering[,] difficulty breathing," and fatigue allegedly caused by defendants' refusals to increase plaintiff's dosage of Lasix. (Id. at 71).

IV.     Hematuria and Bladder Cancer

Plaintiff alleges "from the day [he] entered" the Jail on August 25, 2017, he reported to CCS staff he was passing blood in his urine, "sometimes" observing "a blood clot [as] big as an egg" and urinating a half-pint of blood twice a week. (Compl. at 7).

Around September 25, 2017, plaintiff alleges he reported bloody urine to Dr. Park, who told him "urinating blood was not an emergency." (Compl. at 7). Plaintiff describes Dr. Park as offering "no insight, concern or help . . . , just continual indifference and [disregard] causing [plaintiff] constant anguish, fright, fear, and undue worry." (Id.).

Plaintiff again reported blood in his urine on October 3 and October 30, 2017. He alleges his urine tested positive for blood in October 2017.

On November 29, 2017, CCS medical staff allegedly submitted plaintiff's blood specimen to a lab "with no test indicated," delaying diagnosis and treatment. (Compl. at 43). The next day, plaintiff allegedly reported to another judge of this court that plaintiff had received inadequate medical treatment for hematuria. Upon returning to the Jail, Nurse Practitioner Uszynski tested plaintiff's urine and found no blood. Plaintiff alleges Uszynski falsified the test's results.

Around two weeks later, on December 14, 2017, plaintiff went to WMC for a urology appointment at which his urine tested positive for blood. A CCS medical record dated December 19, 2017, indicates a test for bloody urine came back positive.

On December 19, 2017, plaintiff alleges Arancherill told plaintiff he had tested positive for bladder cancer. (See Compl. at 32). A follow-up test in January 2018 came back "positive for high grade cancer cells." (Id. at 29).

Plaintiff claims he tested negative for bladder cancer before arriving at the Jail, and that defendants' failure to provide prompt treatment caused his bladder cancer.

After his cancer diagnosis, plaintiff underwent a cystoscopy on January 18, 2018; another cystoscopy on February 20, 2018; and a bladder biopsy on March 12, 2018. To perform the biopsy, a WMC doctor allegedly inserted a Foley catheter that was supposed to be removed three

days later.  Plaintiff alleges he told several CCS staff members his catheter was to be removed on March 15, 2018, and a CCS medical record notes the catheter was supposed to be removed on that day.  On March 15, plaintiff saw CCS staff who noted the catheter remained in place; however, the catheter was not removed until March 24, 2018—"9 days after [the] due date"—when plaintiff showed a CCS nurse WMC medical records noting the catheter's intended date of removal.  (Compl. at 61).

The doctor who inserted the catheter allegedly recommended plaintiff treat his cancer with six treatments of "BCG therapy" and a follow up, and that he return to WMC six to eight weeks later for another biopsy.  In what plaintiff alleges was an act of "personal, vindictive, sabotage," Dr. Ulloa, CCS's Medical Director, purportedly sent plaintiff back to WMC just three weeks later.  (Compl. at 56).  The WMC doctor allegedly was "unable to comprehend why [plaintiff] was back" so soon and called Dr. Ulloa to discuss plaintiff's treatment plan.  (Id. at 25).

On February 14, 2018, plaintiff claims he erroneously was taken to a urology appointment on the wrong day, despite his medical paperwork listing the correct date in "bold capital letters."  (Compl. at 60).  Six days later, plaintiff underwent a urological test that identified abnormalities in his bladder.

Plaintiff alleges a federal prosecutor handling plaintiff's criminal case falsely stated in an April 2018 letter to another judge of this court that the Jail could not provide plaintiff BCG therapy, even though a WMC doctor had identified a nearby hospital capable of providing it. The letter in question states the government was working with the U.S. Marshals Service to accommodate plaintiff's "unique medical needs."  (See Pl. Opp. Br. at 4–5).  Plaintiff claims defendants "maliciously lied to the [prosecutor] . . . about where the BCG treatment [could] be

done" in order to "orchestrate a transfer" to keep him quiet, because plaintiff had allegedly witnessed CCS staff abuse an elderly inmate. (Continued Compl. at 5). Three days later, plaintiff was transferred from the Jail to the Metropolitan Correctional Center ("MCC").

Plaintiff alleges his transfer to MCC delayed his BCG therapy until at least August 21, 2018, potentially requiring him to undergo a new biopsy and more invasive treatment and causing his cancer to progress.

Plaintiff also claims he was transferred "to stop [him] from be[ing] a whistle blower" (Pl. Opp. Br. at 2), and that defendants "do not want to treat [him] so [he] will die before [he is] able to sue them" (Compl. at 9).

V.    Grievances

In addition to alleging constitutionally inadequate medical care, plaintiff claims that during an unspecified period, he filed prison grievances that fell on "deaf ears." (Compl. at 8). According to the amended complaint, a correction official denied one of plaintiff's grievances in September 2017 in a memorandum allegedly containing false information. In October 2017, plaintiff claims he tried to submit a grievance to defendant Randazzo, but Randazzo threw it in the garbage. Plaintiff also claims non-party Sergeant Dichara ordered a search of plaintiff's cell in February 2018 and "lied saying he smell[ed] tobacco smoke on [plaintiff]," allegedly in retaliation for a grievance plaintiff filed concerning a digestive medication. (Pl. Opp. Br. at 1).

Finally, plaintiff alleges Warden Vollmer wrongly denied plaintiff's grievance concerning alleged delays in medical care for his hematuria. Vollmer's memorandum inaccurately states plaintiff "first complained of blood in [his] urine on 11/30/17," and notes plaintiff attended a urology clinic appointment two weeks later. (Continued Compl. at 19). In fact, CCS records document plaintiff complained of hematuria as early as September 27, 2017

(see Compl. at 44), and plaintiff alleges he reported his hematuria to Jail staff as soon as he arrived.

VI.     February 20, 2018, Incident

Plaintiff alleges that while temporarily housed in the Jail's medical unit on February 20, 2018, he observed three non-party nurses physically assault an elderly inmate. Plaintiff alleges he started yelling, and Dr. Park and another doctor responded. Dr. Park allegedly told plaintiff not to worry about the other inmate and to worry only about himself.

Plaintiff alleges witnessing this incident caused him trauma. He claims he was transferred to MCC because he complained about the abuse he observed. In his opposition brief, he asserts that if he were housed at the Jail's medical unit, he would "go public with what [he] saw [on] Feb[ruary] 20th 2018." (Pl. Opp. Br. at 1.)

**DISCUSSION**

I.      Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544

(2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

The Court must liberally construe a pro se litigant's submissions[7] and interpret them "to raise the strongest arguments that they suggest."  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted).  Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges a civil rights violation.  See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008).  "Even in a pro se case, however, . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted).  Nor may the Court "invent factual allegations" a plaintiff has not pleaded.  Id.

II.     Defendants Vollmer and Diaz

Defendants argue plaintiff's claims against Warden Vollmer must be dismissed for failure adequately to plead Vollmer's personal involvement in an alleged constitutional violation.

---

[7]     "Although the Court is typically confined to the allegations contained within the four corners of the complaint, when analyzing the sufficiency of a pro se pleading, a court may consider factual allegations contained in a pro se litigant's opposition papers and other court filings."  Rodriguez v. Rodriguez, 2013 WL 4779639, at *1 (S.D.N.Y. July 8, 2013) (citations and internal quotations marks omitted).

Plaintiff will be provided copies of all unpublished opinions cited in this decision.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

The Court agrees, and for the same reason dismisses sua sponte plaintiff's claims against Warden Diaz.

A plaintiff asserting a Section 1983 claim plausibly must allege each defendant's personal involvement in a constitutional violation. Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir. 2001); see Ashcroft v. Iqbal, 556 U.S. at 676. Thus, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.'" Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004) (quoting Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)).

Even liberally construed, the amended complaint does not allege any facts suggesting Vollmer or Diaz directly participated in a constitutional violation, knew of a constitutional violation they failed to remedy, acted with gross negligence in supervising subordinates, acted with deliberate indifference, or otherwise created or countenanced a policy or custom under which a constitutional violation occurred. Cf. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). Indeed, aside from plaintiff's allegation that Vollmer denied plaintiff's grievance—which the Court addresses below—the body of the amended complaint does not mention Vollmer or Diaz at all.

Accordingly, defendant's motion to dismiss plaintiff's claims against Vollmer is granted, and plaintiff's claims against Diaz are dismissed sua sponte for failure to state a claim. See 28 U.S.C. § 1915(e)(2)(B)(ii); see also Abbas v. Dixon, 480 F.3d at 639.

III.  Prison Grievances

Defendants argue plaintiff's claims arising from his prison grievances should be dismissed because plaintiff has no constitutional right to a prison grievance procedure.

The Court agrees.

"A prisoner has no constitutional right to a prison grievance procedure or to have his grievances investigated." Hayes v. County of Sullivan, 853 F. Supp. 2d 400, 434 (S.D.N.Y. 2012) (collecting cases). Accordingly, plaintiff's allegations that defendants denied or refused to accept plaintiff's grievances do not state a viable constitutional claim.

IV.     Plaintiff's Transfer to MCC

Defendants argue plaintiff fails plausibly to allege he was transferred from the Jail to MCC in a conspiracy to prevent him from reporting the alleged physical abuse he says he witnessed on February 20, 2018.

The Court agrees.

Plaintiff alleges he was transferred from the Jail because he "complain[ed] about the abuse [he] saw" in the Jail's medical unit on February 20, 2018. (Continued Compl. at 3). The Court liberally construes this allegation as asserting a retaliation claim under the First Amendment.

To adequately plead a First Amendment retaliation claim, plaintiff must allege (i) he engaged in constitutionally protected speech or conduct; (ii) a defendant took adverse action against him; and (iii) the protected speech and adverse action are causally connected. Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015) (quoting Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009)).

Courts "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dolan v. Connolly, 794 F.3d at 295 (quoting Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003)). Accordingly, a prisoner pursuing a retaliation claim must not rest

on "wholly conclusory" allegations, but rather must allege "specific and detailed" supporting facts. Id. (citations omitted).

The amended complaint does not do so. Plaintiff has not pleaded any facts, let alone "specific and detailed" facts, suggesting any defendant arranged for plaintiff's transfer to keep him from reporting alleged abuse. Dolan v. Connolly, 794 F.3d at 295 (citation omitted). Here, plaintiff's transfer to a new facility after allegedly witnessing abuse of another inmate, absent anything more, does not itself give rise to a plausible inference of retaliation. Plaintiff therefore fails plausibly to allege a causal connection between his protected speech and defendants' adverse action.

Moreover, plaintiff also fails plausibly to allege his transfer to a facility purportedly better positioned to provide him medical care amounts to an adverse action capable of supporting a First Amendment claim.

Thus, plaintiff's retaliation claim is dismissed.

V.      Fourteenth Amendment Claims

Defendants argue plaintiff fails plausibly to allege defendants acted with deliberate indifference by providing plaintiff constitutionally inadequate medical care for any of his medical conditions.

The Court agrees as to plaintiff's allegations respecting orthopnea, congestive heart failure and pulmonary congestion, bladder cancer, and the delay in receiving BCG therapy. However, the Court disagrees as to plaintiff's allegations concerning his digestive maladies, hematuria, and the removal of his Foley catheter.

A.     Standard of Review

Because plaintiff was a pretrial detainee at all relevant times, the Court analyzes his deliberate indifference claim under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment.  See Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007)).  "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions."  Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted).  To state such a claim, plaintiff's allegations must satisfy two prongs:  an objective prong and a mens rea prong.  Namely, plaintiff must plausibly allege "that the challenged conditions were sufficiently serious," and defendants "acted with at least deliberate indifference to the challenged conditions."  Id.

1.     Objective Prong

To plead the objective prong, a pretrial detainee must plausibly allege the challenged conditions, "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health."  Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)).  "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'"  Id. at 29 (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

In the context of medical care, two inquiries determine whether a deprivation is objectively serious.  "The first inquiry is whether the prisoner was actually deprived of adequate medical care."  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006).  Because prison officials' "duty is only to provide reasonable care," prison officials are liable only if they fail "'to

take reasonable measures' in response to a medical condition." Id. at 279–80 (quoting Farmer v. Brennan, 511 U.S. 825, 827 (1994)).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious." Salahuddin v. Goord, 467 F.3d at 280. This question "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. (citing Helling v. McKinney, 509 U.S. 25, 32–33 (1993)). If the allegedly offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id. (citation omitted). Relevant factors in determining "the seriousness of the medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" Id. (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

If the offending conduct is the medical treatment itself, however, "the seriousness inquiry is narrower." Salahuddin v. Goord, 437 F.3d at 280. When "the prisoner is receiving appropriate on-going treatment for his condition [and] brings a . . . denial of medical care claim based on a temporary delay or interruption in treatment," courts look to "the severity of the temporary deprivation alleged by the prisoner," not "the severity of the prisoner's underlying medical condition." Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003). To qualify as a severe temporary deprivation, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

2.        Mens Rea Prong

To plead the mens rea prong, a pretrial detainee must plausibly allege "that the defendant-official acted intentionally . . . , or recklessly failed to act with reasonable care to mitigate the risk that the condition posed . . . even though the defendant-official knew, or should have known," of the risk.  Darnell v. Pineiro, 849 F.3d at 35.  The Fourteenth Amendment's mens rea prong "is defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm."  Id.

"[D]istinguishing between negligent and reckless medical care is a difficult task, especially at the motion-to-dismiss stage where courts lack the benefit of expert opinion."  Zhang v. City of New York, 2018 WL 3187343, at *8 (S.D.N.Y. June 28, 2018) (quoting Richardson v. Corr. Med. Care, Inc., 2018 WL 1580316, at *6 (N.D.N.Y. Mar. 28, 2018)).  Courts often look to the "degree of risk associated with the negligent treatment" and have found the mens rea prong satisfied when a plaintiff did not receive treatment for a documented condition or complaint.  See id. (citations omitted).

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to" a constitutional violation.  Chance v. Armstrong, 143 F.3d at 703 (citation omitted).

B.        Application

Plaintiff claims defendants provided constitutionally inadequate treatment for orthopnea, digestive maladies, congestive heart failure, hematuria, and bladder cancer.

Defendants argue plaintiff fails adequately to plead the <u>mens rea</u> prong as to any of his conditions. Defendants do not address the objective prong.

The Court addresses each medical condition in turn.

    1.    <u>Orthopnea</u>

Defendants argue plaintiff's allegations concerning treatment for orthopnea should be dismissed for failure sufficiently to plead defendants' <u>mens rea</u>.

The Court agrees.

Plaintiff alleges defendants did not provide him extra blankets until eleven days after a doctor recommended plaintiff manage his orthopnea by sleeping at an incline. However, the amended complaint alleges no facts suggesting any defendant either intentionally or recklessly failed to provide the extra blankets. Rather than ignoring plaintiff's concerns, a nurse practitioner allegedly arranged for plaintiff to receive extra blankets immediately upon learning plaintiff had not yet been given them. Nor does plaintiff's conclusory allegation that he "could have lost my life for lack of two cheap blankets" indicate any defendant may have deprived plaintiff of extra blankets either intentionally or with reckless disregard for a serious risk to plaintiff's health. (Compl. at 24).

Accordingly, the Court dismisses plaintiff's claim arising from treatment for orthopnea.

    2.    <u>Digestive Maladies</u>

Defendants argue plaintiff inadequately pleads the <u>mens rea</u> prong with respect to plaintiff's Prevacid prescriptions and dosage, which plaintiff claims periodically caused him constant vomiting and to go without food for days at a time.

The Court disagrees.

First, plaintiff's alleged inability to digest food without taking Prevacid implicates a medical need sufficiently serious to satisfy the Fourteenth Amendment's objective prong. Plaintiff alleges he had to submit sick call slips every two weeks requesting Prevacid and then would "wait and go without eating" until new prescriptions were filled. (Compl. at 7). Plaintiff alleges several delays in treatment and claims he could not digest any food at all for several lengthy periods of time. (See id. at 91 (plaintiff allegedly requested Prevacid renewal on September 3, 2017, but was not seen until September 6); id. at 87 (plaintiff allegedly requested Prevacid renewal on October 6, 2017, but was not seen until October 10); id. at 86 (plaintiff allegedly requested Prevacid renewal on October 20, 2017, was seen October 21, and had to "wait[] a couple [of] day[s]" for Prevacid to be delivered)). In support, plaintiff attaches a March 5, 2018, WMC medical record advising defendants to continue plaintiff on Prevacid, "OTHERWISE PATIENT UNABLE TO EAT." (Continued Compl. at 12).

Assuming plaintiff's allegations as true for purposes of the motion to dismiss, defendants' repeated delays in providing Prevacid plausibly caused plaintiff to repeatedly go without eating for several consecutive days—a result "sufficiently harmful" to implicate plaintiff's "serious medical needs." Smith v. Carpenter, 316 F.3d at 186 (quoting Estelle v. Gamble, 429 U.S. at 106); cf. Boadi v. City of New York, 2012 WL 3062063, at *4 (E.D.N.Y. July 26, 2012) ("[P]laintiff's allegation that he was unable to eat, drink, or use the bathroom for 18 consecutive hours is sufficient to avoid dismissal for failure to state a claim." (citations omitted)).

Second, documents attached to the amended complaint plausibly evidence that CCS medical staff knew plaintiff could not digest food or other medications without sufficient Prevacid. Plaintiff explicitly alleges he told a CCS nurse he was "unable to eat without taking

Prevacid or [his] food will come back up" (Compl. at 6), and that he told Dr. Park his once-daily Prevacid prescription was insufficient and rendered him unable to eat breakfast. Moreover, "Refusal of Treatment" forms attached to the amended complaint document plaintiff's repeated statements to CCS staff—on at least five occasions—that without Prevacid, plaintiff could not take his other medications without vomiting. (See id. at 73–77). These allegations plausibly indicate defendants either knew of, or recklessly failed to act with reasonable care to mitigate, plaintiff's inability to eat without adequate Prevacid.

Accordingly, plaintiff's Fourteenth Amendment claim arising from treatment for his digestive maladies will proceed.

### 3. Congestive Heart Failure and Pulmonary Congestion

Defendants argue plaintiff's allegations concerning treatment for congestive heart failure and pulmonary congestion fail to state a Fourteenth Amendment claim.

The Court agrees, finding plaintiff fails plausibly to allege the mens rea prong as to his pulmonary conditions.

Plaintiff alleges he complained of weight gain and difficulty breathing on November 27, 2017. (See Compl. at 62). The next day, plaintiff saw a nurse practitioner who prescribed Lasix and instructed plaintiff to report any worsened symptoms "ASAP." (Id. at 64). Eight days later, plaintiff reported "no dizziness" and "no [shortness of breath]." (Id. at 49).

In mid-December, plaintiff reported feeling "a little short of breath." (Compl. at 66). A nurse observed him in "[n]o distress," advised he get some rest, and instructed him to keep medical staff informed of any new or worsening symptoms. (Id.). CCS staff checked plaintiff's weight and blood pressure four days later.

19

In January 2018, plaintiff was taken to a WMC specialist who recommended plaintiff take forty milligrams of Lasix daily. An "obvious oversight" allegedly caused an eleven-day delay in implementing this recommendation. (Compl. at 17).

Defendants' responses to plaintiff's complaints concerning congestive heart failure and pulmonary congestion do not indicate defendants acted with intentional or reckless disregard for a serious risk to plaintiff's health. Rather, the medical records show defendants acted reasonably by monitoring plaintiff's condition, prescribing Lasix at an initial dose of twenty milligrams, advising plaintiff to promptly alert medical staff of any changes in symptoms, referring plaintiff to an outside specialist, and ultimately implementing the specialist's treatment recommendation. Those actions were reasonable; the constitution does not require anything more. Cf. Chance v. Armstrong, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." (citation omitted)).

As for defendants' alleged eleven-day delay in implementing Dr. Kahn's recommendation of Lasix, although defendants' alleged failure to promptly increase plaintiff's Lasix dosage might have been negligent, plaintiff has not pleaded any facts suggesting it was caused by a defendant's intentional or reckless conduct; nor does plaintiff allege the delay caused him any particular injury. Accordingly, the alleged delay in increasing plaintiff's Lasix dosage cannot support a Fourteenth Amendment claim. See Chance v. Armstrong, 143 F.3d at 703 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." (citing Estelle v. Gamble, 429 U.S. at 105–06)).

Thus, plaintiff fails to state a claim for failure to provide constitutionally adequate medical care for congestive heart failure or pulmonary congestion.

4. <u>Hematuria</u>

Defendants argue plaintiff fails adequately to plead the <u>mens rea</u> prong with respect to his medical care for hematuria and bladder cancer.

With respect to defendants' (i) alleged delay in treating plaintiff's hematuria and (ii) alleged failure to timely remove plaintiff's Foley catheter, the Court disagrees. However, the Court agrees as to plaintiff's allegations concerning his medical care after his cancer diagnosis.

i. <u>Delay in Treating Plaintiff's Hematuria</u>

First, plaintiff plausibly claims defendants Ulloa, Park, and Uszynski acted intentionally or recklessly in treating plaintiff's hematuria. Plaintiff alleges he told Jail staff he suffered from hematuria upon arriving at the Jail on August 25, 2017. Approximately one month later, plaintiff claims he reported blood in his urine to Dr. Park. Dr. Park responded by telling plaintiff the condition was not an emergency, and the amended complaint does not suggest Dr. Park arranged for any follow up. Plaintiff claims he continued reporting blood in his urine for more than a month, including to Dr. Ulloa (<u>e.g.</u>, Compl. at 45) and Nurse Practitioner Uszynski (<u>e.g.</u>, <u>id</u>. at 48). Nonetheless, plaintiff allegedly was not tested, treated, or taken to a urologist until mid-December—around four months after first complaining of hematuria.

In view of plaintiff's repeated complaints of hematuria to Ulloa, Park, and Uszynski, and drawing all inferences in plaintiff's favor, the Court finds it plausible at this early stage of the case that by failing promptly to treat plaintiff for that condition, those defendants recklessly failed to act with reasonable care to mitigate a serious risk plaintiff's hematuria posed to his health.

Accordingly, plaintiff's Fourteenth Amendment claim against Ulloa, Park, and Uszynski arising from the delay in plaintiff's treatment for hematuria shall proceed.

ii.     Treatment for Bladder Cancer

Second, plaintiff fails adequately to plead the mens rea prong with respect to his initial treatment for bladder cancer.

Plaintiff alleges he learned of his cancer diagnosis in late December 2017.  In January 2018, he saw a WMC urologist who performed a cystoscopy and instructed plaintiff to return in two to four weeks.  In February, the same urologist performed a second cystoscopy that "identif[ied] the abnormal areas in [plaintiff's] bladder."  (Compl. at 24).  On March 12, 2018, plaintiff underwent a biopsy during which a Foley catheter was inserted.  Three days later, on March 15, 2018, the WMC urologist told plaintiff "he will need BCG therapy."  (Id. at 56).

Viewing these allegations in the light most favorable to plaintiff, defendants responded actively to plaintiff's cancer diagnosis by promptly arranging for multiple specialist appointments, including multiple cystoscopies and a biopsy.  Plaintiff's dissatisfaction with this adequate treatment amounts to a mere disagreement with his healthcare providers; such a disagreement cannot support a Fourteenth Amendment deliberate indifference claim.  Cf. Chance v. Armstrong, 143 F.3d at 703.

Accordingly, the Court dismisses any claim based on plaintiff's treatment for bladder cancer through March 15, 2018.

iii.     Delay in Removing the Foley Catheter

Third, plaintiff sufficiently alleges defendants intentionally or recklessly failed to timely remove the Foley catheter.

The catheter was supposed to be removed on March 15, 2018, but was not removed until March 23. Plaintiff alleges that in the interim, he repeatedly told multiple CCS employees, including several defendants, the catheter was supposed to have been removed; however, his complaints allegedly "all fell on deaf ears." (Continued Compl. at 1). Defendants' alleged <u>mens rea</u> also is supported by a CCS medical record dated March 14, 2018, recognizing that plaintiff was to "[follow up] on 3/15/18 for Foley removal." (Continued Compl. at 21). Nonetheless, plaintiff claims the catheter remained inserted for more than a week, until he showed a nurse a hard copy of his WMC medical records stating when the catheter was supposed to be removed.

Again viewing the amended complaint in the light most favorable to plaintiff, these allegations plausibly evidence defendants recklessly failed to remove the catheter for nine days—indeed, plaintiff explicitly alleges defendants declined to remove the catheter despite his repeated requests and complaints that defendants were failing to follow WMC's instructions.

Accordingly, the Court declines to dismiss for failure adequately to plead defendants' <u>mens rea</u> plaintiff's allegations concerning the catheter's removal.

### iv. Delay in Providing BCG Therapy

Lastly, plaintiff fails plausibly to allege defendants intentionally or recklessly failed to arrange for plaintiff to receive BCG therapy.

Plaintiff alleges a WMC urologist told plaintiff on March 15, 2018, he needed BCG therapy. A WMC medical record dated April 5, 2018, states plaintiff should "[r]eturn in 3 months" and "[m]ay need a surveillance cystoscopy" if BCG therapy was not performed. (Continued Compl. at 24). One week later, plaintiff was transferred to MCC. (<u>See</u> Pl. Opp. Br. at 10).

In sum, the amended complaint alleges CCS staff arranged for plaintiff to follow up with his urologist fifteen days after the urologist first recommended BCG therapy. At that subsequent appointment, the urologist "[e]xplained to [plaintiff] that BCG therapy [is] not done at [WMC]." (Continued Compl. at 24). Four days later, plaintiff was transferred to another facility in an effort to attend to plaintiff's "unique medical needs." (Id. at 13).

These allegations do not suggest any defendant acted with deliberate indifference towards plaintiff's bladder cancer. To the contrary, defendants acted responsively to the urologist's treatment recommendation from the date of plaintiff's cancer diagnosis through plaintiff's transfer out of defendants' care.

Accordingly, the Court dismisses plaintiff's deliberate indifference claim arising from the delay in providing BCG therapy.

\* \* \*

In summary, the Court dismisses plaintiff's Fourteenth Amendment claims arising from his medical care for orthopnea, his treatment for congestive heart failure and pulmonary congestion, and treatment for bladder cancer. However, plaintiff's Fourteenth Amendment claims respecting his Prevacid prescriptions, delayed treatment for hematuria, and defendants' alleged delay in removing plaintiff's Foley catheter shall proceed.

VI.    Monell Claim

Defendants argue plaintiff's allegations against CCS fail to state a claim under Monell v. Department of Social Services, 436 U.S. 658 (1978), because plaintiff does not adequately plead CCS had a custom or policy that caused him to suffer a constitutional deprivation.[8]

---

[8]    As a private corporation under contract with Westchester County to provide medical care to inmates, CCS is subject to a Monell claim. See Mejia v. City of New York, 119 F. Supp. 2d 232, 275 (E.D.N.Y. 2000) (collecting cases).

The Court agrees.

Under Monell, a municipality is liable under Section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury." Monell v. Dep't of Soc. Servs., 436 U.S. at 694. Thus, to assert a Section 1983 claim against a municipality, a plaintiff must show the existence of an official policy or custom that caused injury, and a direct causal connection between that policy or custom and the deprivation of a constitutional right. See Jones v. Town of East Haven, 691 F.3d 72, 80–81 (2d Cir. 2012) (citations omitted).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following: (i) "a formal policy officially endorsed by the municipality"; (ii) "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question"; (iii) "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware"; or (iv) "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Plaintiff alleges two CCS policies caused him to suffer a constitutional violation: (i) a "no pillow(s) policy" (Compl. at 9); and (ii) CCS's alleged policy of issuing him two-week prescriptions for Prevacid.

Plaintiff fails to meet the Monell standard for either allegation.

First, with respect to the Jail's alleged "no pillow(s) policy" (Compl. at 9), plaintiff alleges only one instance when defendants refused to give him pillows (and gave him extra

blankets instead). One instance is insufficient as a matter of law adequately to plead a policy or custom under Monell. See DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)). Thus, plaintiff's Monell claim respecting the Jail's alleged no-pillows policy is dismissed.

Second, plaintiff alleges CCS had a custom or policy of issuing him two-week prescriptions and requiring him to submit sick calls each time his prescriptions ran out, which allegedly deprived plaintiff of Prevacid and caused him to suffer "constant vomiting, pain and suffering." (Pl. Opp. Br. at 1). However, to adequately plead a policy or custom under Monell, plaintiff must plausibly allege similar incidents involving others. See Iacovangelo v. Corr. Med. Care, Inc., 624 F. App'x 10, 14 (2d Cir. 2015) (summary order) (affirming dismissal of Monell claim and noting, "other than the plaintiff, the amended complaint provides only one additional example of a similar incident"). Plaintiff has not done so: the amended complaint makes no mention of medical treatment given any other inmate under any defendant's care. Plaintiff therefore has not adequately pleaded a policy or custom arising from prescriptions issued at the Jail.

Accordingly, the Court dismisses plaintiff's Monell claim against CCS.

VII.    State Law Claims

Plaintiff lists four state law claims in his original complaint: medical malpractice, negligence, defamation, and "infliction of emotional distress." (Compl. at 2).

Defendants argue plaintiff's state law causes of action must be dismissed for failure to comply with New York General Municipal Law Sections 50-d and 50-i, which require plaintiff to have timely filed a notice of claim respecting his state law claims against defendants.

The Court agrees.

New York's notice of claim requirement applies to plaintiff's state law claims against Dr. Ulloa, Dr. Park, Nurse Practitioner Uszynski, and Nurse Practitioner Arancherill. See Ayers v. Mohan, 154 A.D.3d 411, 412–13 (1st Dep't 2017) (citations omitted) ("Dr. Ulloa falls within the ambit of [N.Y. Gen. Mun. Law] § 50-d, which imposes a statutory obligation on the County to indemnify and defend Dr. Ulloa against medical malpractice claims and required plaintiffs to serve a notice of claim on the County."); Whittle v. Ulloa, 2016 WL 7351895, at *6 (S.D.N.Y. Dec. 19, 2016) (dismissing state law negligence and medical malpractice claims against Ulloa and Uszynski for failure to allege compliance with New York's notice of claim requirement).

Accordingly, plaintiff's state law claims are dismissed.

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff's Fourteenth Amendment claims against Dr. Ulloa, Dr. Park, Nurse Practitioner Uszynski, and Nurse Practitioner Arancherill arising from plaintiff's (i) Prevacid prescriptions, (ii) delayed treatment for hematuria, and (iii) delayed removal of his Foley catheter, shall proceed.

All other claims are dismissed.

By March 25, 2019, the remaining defendants shall file an answer to the amended complaint.

The Clerk is instructed to (i) terminate the motion (Doc. #34), and (ii) terminate defendants Correct Care Solutions, Sergeant Randazzo, Warden Diaz, and Warden Vollmer.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

Dated: March 11, 2019
      White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge